2009 OK CIV APP 106

**Carrol L. BUNCH, Plaintiff/Appellee,**

v.

**Russell E. TERPENNING d/b/a Signature Real Estate & Finance, Golden Years Investments L.L.C., Keller Heating and Air Conditioning Inc., and Dan Keller, Defendants/Appellants.**

**No. 106,725.**

Court of Civil Appeals of Oklahoma, Division No. 4.

Nov. 19, 2009.

Michael L. Loyd, Michael L. Loyd & Associates, Bethany, OK, for Plaintiff/Appellee.

Jerome S. Sepkowitz, Derryberry & Naifeh LLP, Oklahoma City, OK, for Defendants/Appellants.

JOHN F. FISCHER, Judge.

¶ 1 Russell E. Terpenning d/b/a Signature Real Estate & Finance (Terpenning) and Golden Years Investments L.L.C. (Golden Years) appeal the decision of the district court finding a loan from Terpenning to Carrol L. Bunch void pursuant to the provisions of the Oklahoma Consumer Credit Code, (Code) 14A O.S.2000 2008 §§ 1–101 through 9–903, and granting summary judgment to Bunch. Based on our review of the record on appeal and applicable law, we affirm.

## BACKGROUND

¶ 2 In February 2005, Bunch contracted with Keller Heating and Air Conditioning Inc. (Keller) to improve the heating, air conditioning and hot water services of his residence in Oklahoma City. Bunch claimed he was attracted to Keller by an offer to finance the improvements he desired. The record contains a Keller flier, stating "if you have been turned down in the past due to credit problems ... Call Me! I can help you get a new reliable and efficient unit." Bunch subsequently met with Keller owner Dan Keller, and, on February 15, 2005, signed a $20,000 note between himself and Terpenning, secured by a twenty-year mortgage on Bunch's residence (the Bunch Loan).

¶ 3 The note recited an annual interest rate of 15.99%, and the mortgage stated that the note provided for monthly installments of principal and interest. Four days later, Terpenning assigned the $20,000 note and mortgage to Golden Years. A February 13, 2005 e-mail between Terpenning and Dan Keller describes distribution of the loan proceeds as follows: Golden Years was to pay $15,000 for the assignment of the $20,000 note. From this $15,000 would come a $5,900 cash advance to Bunch, $495 in loan fees, $2,200 for materials for the heat and air-conditioning work, and "approximately $6,405 profit."

¶ 4 By mid-April 2005, Bunch was dissatisfied with the progress and quality of the work Keller was performing, and asked Ter-

penning to return the money paid to Keller so that he could secure an alternative contractor to complete the work. In July 2006, still dissatisfied, Bunch asked Terpenning to return the monthly payments he had made on the note. In March 2007, Bunch sued Terpenning and Golden Years, alleging they had violated the Code by making and attempting to collect a supervised consumer loan while not licensed in Oklahoma as supervised lenders. Bunch further alleged that Keller Inc. had breached the air-conditioning installation contact.[1] Five days after Bunch filed his suit, Golden Years filed a foreclosure action against Bunch's property alleging default on the note it had purchased. The foreclosure action was consolidated with this case.

¶5 Bunch and Terpenning subsequently filed motions for summary judgment focusing on whether the $20,000 loan was a "supervised consumer loan" pursuant to the Code. Following these motions, the district court held that the Bunch Loan was a supervised consumer loan, and reserved the issues of damages, costs and fees for a future evidentiary hearing. The district court's subsequent judgment found that (1) Terpenning violated Section 3–502 of the Code by making a supervised consumer loan to Bunch without the appropriate licensing; (2) Golden Years violated Section 3–502 by taking assignment of, and attempting to collect the loan; and, (3) Bunch was not required to pay the remaining principal and interest on the loan pursuant to Section 5–202(2) of the Code, but could not recover any payments he had previously made. The district court dismissed Golden Years's foreclosure action. Terpenning appeals the decision that the Bunch loan was a supervised consumer loan and the consequent voiding of Bunch's obligation to repay it. Golden Years appeals the district court's dismissal of its foreclosure action.

## STANDARD OF REVIEW

¶6 We review a trial court's grant of summary judgment de novo. *Carmichael v. Beller,* 1996 OK 48, ¶2, 914 P.2d 1051, 1053. On review, we examine the pleadings and evidentiary materials submitted by the parties to determine whether there exists a genuine issue of material fact. *Id.* This Court bears "an affirmative duty to test all evidentiary material tendered in summary process for its legal sufficiency to support the relief sought by the movant." *Copeland v. The Lodge Enters., Inc.,* 2000 OK 36, ¶8, 4 P.3d 695, 699. The summary process requires that we determine whether the record reveals only undisputed material facts supporting only a single inference that favors the movant's motion for summary judgment. *Id.* Further, when considering a motion for summary judgment, the evidence and the inferences to be drawn from the evidence must be viewed in the light most favorable to the party opposing the motion. *Hargrave v. Canadian Valley Elec. Co-op., Inc.,* 1990 OK 43, ¶14, 792 P.2d 50.

¶7 This case also involves a question of statutory construction. Statutory construction is a question of law which we review de novo, without deference to the lower court. *Twin Hills Golf & Country Club, Inc. v. Town of Forest Park,* 2005 OK 71, ¶5, 123 P.3d 5, 6.

## DISCUSSION

¶8 Terpenning and Golden Years's appeals raise eleven assignments of error. However, they assert essentially three legal issues: (1) whether the Bunch Loan was a "supervised consumer loan;" (2) whether Terpenning violated the Code by making the loan; (3) and whether Golden Years violated the Code by taking assignment of the loan and/or filing the foreclosure action.

### I. Supervised Loans and Consumer Loans

¶9 Terpenning's fundamental allegation of error is that the district court incorrectly found the Bunch Loan to be a "supervised loan." "(1)Unless a person is a supervised financial organization or has first obtained a license from the Administrator authorizing him to make supervised loans, he shall not engage in the business of: (a) making supervised loans...." 14A O.S.2001 § 3–502. A supervised loan is "a consumer loan in which the rate of the loan

---

1. This claim was eventually dismissed with prejudice, and is not at issue in this appeal.

finance charge exceeds ten percent (10%) per year as determined according to the provisions on loan finance charge for consumer loans." 14A O.S.2001 § 3–501(1). Section 3–104 of the Code defines a consumer loan as:

[A] loan made by a person regularly engaged in the business of making loans in which:

(1) the debtor is a person other than an organization;

(2) the debt is incurred primarily for a personal, family or household purpose;

(3) either the debt is payable in installments or a loan finance charge is made; and

(4) either the principal does not exceed Forty-five Thousand Dollars ($45,000.00) or the debt is secured by an interest in land.

Terpenning is not a supervised financial organization nor is he licensed to make supervised loans. Further, Terpenning does not dispute that the Bunch Loan was a consumer loan. He argues, however, that he had made only six consumer loans in 2005, and therefore was not "a person regularly engaged in the business of making loans." The record establishes that Terpenning made ten loans that would satisfy the definition in § 3–104. Nonetheless, Terpenning contends that four of those loans were not consumer loans, and should not be considered when determining if he regularly engaged in the business of making loans. Although we find nothing in the statute requiring the exclusion of non-consumer loans when determining whether a lender is regularly engaged in the business of making loans, for the purposes of this Opinion, we will treat Terpenning as having made only six qualifying loans in 2005.

### A. Regular Engagement Pursuant to Case Law

¶ 10 Terpenning relies on *Barnes v. Helfenbein*, 1976 OK 33, 548 P.2d 1014, and *Rea v. Wichita Mortg. Corp.*, 747 F.2d 567 (10th Cir.1984), to demonstrate that his activity did not constitute "regular engagement" in the business of making loans. Terpenning argues that his "primary business" was not making loans and that *Barnes* and *Rea* indicate that the number of loans relative to a party's other business activities is a factor in determining the regular engagement issue. We find that neither case supports this argument.[2] *Rea* held that a lender that is not subject to regulation pursuant to the Oklahoma Savings and Loan Code of 1970, (at that time 18 O.S.1981 §§ 381.1–381.86), may nonetheless violate the supervised loan provisions of the OCCC.[3] *Barnes* affirmed the trial court's finding that a private individual who had "made infrequent small loans in the past" was not regularly engaged in the business of making loans.[4] 1976 OK 33 at ¶ 2, 548 P.2d 1014.

¶ 11 A review of case law from Oklahoma and other jurisdictions reveals no case determining what number of loans constitutes regular engagement in the business of making loans.[5] Bunch argues that the definition of the regular engagement in the business of

---

**2.** Aside from the difficulties in applying this standard, it would lead to an unsatisfactory result: large organizations could make hundreds of unsupervised loans because they constituted only a fraction of the organization's business. We find nothing in the statute or relevant case law supporting Terpenning's interpretation.

**3.** Rea affirmed summary judgment against the lender based on a violation of the disclosure requirements of § 5–203 of the Code but reversed the judgment as to the equitable relief authorized by § 5–202 finding that this relief was subject to a defense of reliance on the advice of counsel, a question of fact. Terpenning does not rely on the advice of counsel defense.

**4.** Further, the loan in *Barnes* did not qualify as a consumer loan irrespective of whether Barnes regularly engaged in the business of making loans: "the loan also fails to satisfy the requirement that the debt be incurred for a personal, family, household or agricultural purpose. It is obvious that the loan was made in pursuit of the borrower's commercial ventures." *Id.* at ¶ 14, 548 P.2d at 1018.

**5.** *See e.g. Decision Point, Inc. v. Reece & Nichols Realtors, Inc.*, 282 Kan. 381, 144 P.3d 706, 710 (2006); *Brown v. Fenner*, 757 P.2d 184, 184 (Colo.Ct.App.,1988); *Bown v. Loveland*, 678 P.2d 292, 296 (Utah 1984); *Bekins Bar v. Ranch v. Huth*, 664 P.2d 455, 460–61 (Utah 1983); *Wasescha v. Terra, Inc.*, 528 P.2d 802, 804 (Utah 1974), all of which determine "regular engagement" without citing any number of loans.

making loans can be determined from the definition of the "regular extension of consumer credit" found in the Code. We find this argument persuasive.

### B. "Regular Engagement" Pursuant to Regulation Z

¶ 12 The provisions of the Code are supplemented by regulations promulgated by the Oklahoma Administrator of Consumer Affairs. *See* 14A O.S.2001 & Supp.2003 §§ 6–103 and 6–501 through 6–510. A footnote to the regulation commonly referred to as "Regulation Z," codified at O.A.C tit. 160 ch. 45, states at Section 160:45–1–2 n. 3 ("definitions and rules of construction") that:

> A person regularly extends consumer credit only if it extended credit ... more than 25 times (or more than 5 times for transactions secured by a dwelling) in the preceding calendar year. If a person did not meet these numerical standards in the preceding calendar year, the numerical standards shall be applied to the current calendar year.

Section 160:45–1–2.(4) of the same regulation states that "Footnotes have the same legal effect as the text of the chapter."[6]

#### 1. Regulation Z and Consumer Loans

¶ 13 Terpenning argues that Regulation Z defines those involved in the provision of goods on credit for the purposes of section 2–104 of the Code, but not "regular engagement in the business of making loans" for the purposes of section 3–104. In adopting Regulation Z, the Oklahoma Legislature expressed an intent that consumer credit transactions should conform to the policies of the Federal Consumer Protection Act. Code section 1–102(f). Regulation Z "conforms to the regulations issued by the Federal Re-serve Board to implement the Federal Consumer Protection Act ... commonly known as the 'Truth in Lending Act [TILA].'" *Dalton v. City of Tulsa*, 1977 OK 25, ¶ 7, 560 P.2d 955, 956; O.A.C. § 160:45–1–1. In *Maltos v. Bison Fed. Credit Union*, 1994 OK CIV APP 83, n. 4, 879 P.2d 1254, 1257 n. 4, this Court stated that "[b]ecause the wording of the Oklahoma disclosure liability statute is virtually identical to the federal disclosure liability provision, we believe it is appropriate to give federal authority construing TILA some weight in determining the proper interpretation of our statute." We find the approach suggested by *Maltos* persuasive.[7]

#### 2. Federal Regulation Z

¶ 14 Only certain "creditors" are required to make disclosures to consumers pursuant to TILA. TILA, (15 U.S.C. § 1602(f)), defines a "creditor" as "a person who regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit...." Federal Regulation Z, (12 C.F.R. § 226.2(17)) defines the "regular extension of consumer credit" for the purposes of TILA as activity exceeding the 25/5 standard set out in O.A.C. § 160:45–1–2 n. 3.

¶ 15 TILA section 1602(f) is clear: "consumer credit" includes the making of loans, and the "extension of credit for goods." It is evident that the TILA disclosure requirements and the accompanying Regulation Z provisions apply to credit transactions involving goods and loans. Further, a review of cases decided pursuant to TILA and other states' consumer credit codes shows that federal and state courts have cited the "25/5" language of Regulation Z in cases involving the disclosure requirements for consumer loans, as well as consumer credit transac-

---

6. Although no Oklahoma case addresses the application of the Regulation Z "25/5" standard to the "regular engagement in the business of making loans" required by Section 3–104, six reported Oklahoma cases discuss Regulation Z. *See Testerman v. First Family Life Ins. Co.*, 1990 OK CIV APP 108, 808 P.2d 703; *Ault v. Gen. Prop. Mgmt. Co.*, 1984 OK CIV APP 15, 683 P.2d 988; *Nat'l Interstate Life Ins. Co. v. Thomas*, 1981 OK 71, 630 P.2d 779; *Grant Square Bank and Trust Co. v. Green*, 1981 OK CIV APP 28, 629 P.2d 1302; *Stephens v. Household Fin. Corp.*, 1977 OK 137, 566 P.2d 1163; *Dalton v. City of Tulsa*, 1977 OK 25, 560 P.2d 955. Of these cases only *Ault* mentions the "25 times or more than 5 times for transactions secured by a dwelling" standard, and does so as dicta.

7. If a state statute is patterned after a federal statute, federal jurisprudence may be instructive when interpreting the Oklahoma statute. *See Barnett v. Simmons*, 2008 OK 100, ¶ 16, 197 P.3d 12, 18; *Payne v. Dewitt*, 1999 OK 93, ¶¶ 8–9, 995 P.2d 1088, 1092–93.

tions.[8] Analysis of the Code further indicates that Oklahoma Regulation Z operates in the same fashion as the federal regulation Z.

### 3. The Code and Regulation Z

¶ 16 Comparing the definition of consumer credit from Code section 2–104 and the definition of consumer loans from section 3–104, the Oklahoma Legislature defined the two in closely related terms.[9] Further, comparing the Code consumer credit disclosure regulations of sections 2–301 through 2–313 with the identically titled consumer loan disclosure regulations of sections 3–301 through 3–312, it is clear that the Legislature intended the aim of "informed use of consumer credit by requiring disclosures about its terms and costs," O.A.C. 160:45–1–1, to apply to both consumer credit sales and consumer loans.

¶ 17 Based on the number of federal and state cases applying Regulation Z to cases involving consumer loans, the similarity of language defining consumer credit and consumer loans in the Code, and the similar disclosure requirements, we find no reason to apply a different interpretation of the language "regularly engaged in the business of making loans." Therefore, a person is regularly engaged in the business of making loans for purposes of section 3–104 of the Code if that person makes more than 25 loans or more than 5 loans secured by a dwelling in the preceding calendar year. Because Terpenning made six loans secured by a dwelling, the district court correctly found that Terpenning regularly engaged in the business of making consumer loans.[10] Consequently, the district court correctly determined that the Bunch Loan was a supervised loan as defined in Code § 3–501.[11]

---

**8.** *See In re Robertson,* 333 B.R. 894, 898 (Bkrtcy. M.D.Fla.2005) ($20,000 loan secured by mortgage); *In re Peterson,* 270 B.R. 719, 721 (8th Cir.BAP 2001)($10,000 loan secured by mortgage); *Reagan v. Racal Mortg., Inc.,* 135 F.3d 37, 40 (1st Cir.1998); *St. Jean v. Racal Mortg.,* 952 F.Supp. 22, 26 (D.Me.1997) (both applying Reg. Z to Maine licensing requirements for supervised lending); *In re Crotzer,* 147 B.R. 252, 253

(Bkrtcy.N.D.Ala.1992) (analyzing $35,000 note to pay for supplies and labor to build a home secured by a mortgage on the debtors' property under Alabama consumer credit law); *Paglia v. Elliott,* 373 N.W.2d 121, 124 (Iowa 1985) ($19,000 loan secured by note and mortgage analyzed under Iowa CCC Section 537.1401(14)(a), which is substantially equivalent to Oklahoma Section 3–104).

**9.** The comparative definitions of the two sections are:

| Section 2–104 (Credit Sales) | Section 3–104 (Loans) |
| --- | --- |
| a "consumer credit sale" is a sale of goods, services or an interest in land in which credit is granted by a person who regularly engages as a seller [if] | a "consumer loan" is a loan made by a person regularly engaged in the business of making loan [if] |
| the buyer is a person other than an organization | the debtor is a person other than an organization |
| the goods, services or interest in land are purchased primarily for a personal, family or household purpose | the debt is incurred primarily for a personal, family or household purpose |
| either the debt is payable in installments or a credit service charge is made | either the debt is payable in installments or a loan finance charge is made |
| the amount financed does not exceed Forty-five Thousand Dollars ($45,000.00) | either the principal does not exceed Forty-five Thousand Dollars ($45,000.00) or the debt is secured by an interest in land |

**10.** It is undisputed that Terpenning made six loans secured by a dwelling. Further, it is undisputed that the interest rate on the Bunch Loan was 15.99 percent per year. Finally, Terpenning operated a company styled as "Signature Real Estate & Finance," and developed a business relationship with at least one third party (Keller) to funnel potential borrowers to Terpenning. Terpenning sold the notes almost immediately to a third party at a 25% discount. None of these activities is consistent with the casual and intermittent personal lending involved in *Barnes.*

**11.** Moreover, aside from the numbers of loans, the Keller flyers are indicative of his activity in attempting to obtain loans of the nature here described.

## II. Supervised Lending and Consumer Loans

¶ 18 Terpenning's second argument is that Regulation Z forms part of the definition of consumer loans only for the purposes of the Code disclosure regulations, not for the purpose of defining a supervised loan. As previously stated, Code § 3–501 (emphasis added) defines a supervised loan as "a *consumer loan* in which the rate of the loan finance charge exceeds ten percent (10%) per year ..." and the only Code definition of "consumer loan" is that found in section 3–104 and clarified by Regulation Z. Although the remedies are different,[12] this fact provides no basis on which to conclude that the different definitions were intended to be applied to different kinds of loans. Terpenning has failed to show, and we find nothing in the statutory language or the text of Regulation Z supporting the conclusion, that the Legislature intended a "consumer loan" to be defined differently when applying the supervised lending regulations than when applying the disclosure regulations.

## III. Unauthorized Lenders and Void Loans

■ ¶ 19 Terpenning's final argument is that the district court erred in voiding Bunch's obligation to repay the remaining principal and interest on the loan. Code section 3–502(1) provides: "[u]nless a person is a supervised financial organization or has first obtained a license from the Administrator authorizing the person to make supervised loans, a person shall not engage in the business of: (a) making supervised loans; or (b) taking assignments and undertaking direct collection of payments from or enforcement of rights against debtors arising from supervised loans." Code section 3–502(2) is unambiguous: "If a creditor has violated the provisions of this act applying to authority to make supervised loans (Section 3–502 of this title), the loan is void and the debtor is not obligated to pay either the principal or loan finance charge."[13] Terpenning has failed to show that the district court erred in voiding the Bunch Loan.

## IV. Assignees That Are Not Supervised Lenders

■ ¶ 20 Golden Years appeals the dismissal of its foreclosure action, arguing that it did not violate the Code by taking assignment of the Bunch Loan or attempting to foreclose on Bunch's home because of his default on the loan. Code section 3–502(1) clearly provides that a party not licensed to make supervised loans is prohibited from "taking assignments and undertaking direct collection of payments from or enforcement of rights against debtors arising from supervised loans."[14] Golden Years argued during the damages phase of the district court proceeding that it retained its rights to the Bunch Loan because section 3–502(1) allows unlicensed lenders to take assignment of a supervised loan, provided they undertake no direct collection of payments.

¶ 21 Golden Years's argument fails for two reasons. First, Code section 3–502(2) provides that a supervised loan made by an unlicensed lender is void. Terpenning could not "rehabilitate" the void loan by assigning it to another unlicensed lender. Second, Golden Years filed suit in Oklahoma to foreclose the Bunch Loan. Foreclosure for nonpayment is clearly an "enforcement of rights" prohibited under section 3–502(1), and we

---

12. The remedy for violating the disclosure sections of the Code in the case of an individual action relating to a credit transaction secured by a dwelling, is limited by § 5–203(1) to any actual damage sustained by that person as a result of the failure, or twice the amount of the credit service or loan finance charge in connection with the transaction, or to $2,000. A lender making an unauthorized supervised loan may be required to repay any principal and interest received, and void the loan pursuant to § 5–202(2).

13. The case of *Kuykendall v. Malernee*, 1973 OK CIV APP 14, ¶ 10, 516 P.2d 558, 563, reaches the same result, finding that, pursuant to section 5–202(2), "both the principal and excessive finance charge are made uncollectible by [the statute] terming any such unauthorized supervised loan void."

14. Bunch's response to Golden Years's argument misquoted the statute, rendering it as "taking assignments **or** undertaking direct collection of payments." We address the issue partially because the district court may have relied on this misstatement of the law.

find this argument without merit. Therefore, we find that Golden Years has failed to show that the district court erred in dismissing Golden Years's foreclosure action.

## CONCLUSION

¶ 22 The record establishes that Terpenning was a person regularly engaged in the business of making loans for the purposes of 14A O.S.2001 § 3–104 and that the Bunch Loan was a supervised loan. Because Terpenning was not authorized to make supervised loans, he violated the provisions of section 3–502. Likewise, Golden Years was not authorized to make supervised loans and, therefore, could not take assignment of the Bunch Loan and attempt to foreclose that loan. The record shows that Bunch was entitled to judgment as a matter of law, and the district court's judgment in favor of Bunch is affirmed.

¶ 23 **AFFIRMED.**

GABBARD, P.J., and RAPP, J., concur.